# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **Jason Goode, Inmate No. 228240** | **CASE NO.** |
| **PLAINTIFF** | |
| **v.** | |
| **Rollin Cook, Commissioner, Connecticut Department of Correction, in his official and individual capacities;** | |
| **Scott Semple, Commissioner, Connecticut Department of Correction, Retired, in his individual capacity;** | |
| **David Maiga, Director, Offender Classification and Population Management, Connecticut Department of Correction, in his official and individual capacities;** | |
| **William Murphy, Director, Programs and Treatment Division, Connecticut Department of Correction, in his official and individual capacities;** | |
| **Ellen Durko, RN, Connecticut Department of Correction, in her individual capacity;** | |
| **Kristine Barrone, Warden, MacDougall-Walker Correctional Institution, Connecticut Department of Correction, in her official and individual capacities;** | |

|                                                      |   |                   |
|------------------------------------------------------|---|-------------------|
| **Giuliana Mudano, Warden,** | |
| **Northern Correctional Institution,** | |
| **Connecticut Department of** | |
| **Correction, in her official and** | |
| **individual capacities;** | |
| | |
| **Angel Quiros, Deputy** | |
| **Commissioner, Operations and** | |
| **Rehabilitative Services Division, in** | |
| **his official and individual** | |
| **capacities;** | |
| | |
| **Andrea Reischerl, Psychiatric** | |
| **APRN, Connecticut Department of** | |
| **Correction, in her individual** | |
| **capacity,** | |
| | |
| **DEFENDANTS** | | **FEBRUARY 13, 2020** |

## COMPLAINT

## INTRODUCTION
`

1.  "The fact that people commit inhumane crimes does not give the state the right to treat them

    inhumanely."  So wrote this Court in finding for Richard Reynolds, an inmate confined for

    the rest of his life at Connecticut's Northern Correctional Institution.  *Reynolds v. Arnone*,

    3:13-cv-1465 (D. Conn. Aug. 27, 2019).

2.  *Reynolds* held, *inter alia*, that the conditions under which an inmate was held on death row at

    Northern Correctional Institution satisfied both the objective and subjective elements of a

    claim that those conditions violated the plaintiff's Eight Amendment protection against cruel

    and unusual punishment.

2

3.  *Reynolds* concerned an inmate sentenced to life in solitary confinement *de jure*.  The plaintiff

    today asks the Court to address a closely related issue:  Does *de facto* indeterminate

    confinement in solitary confinement, under conditions substantially identical to those

    experienced by the plaintiff in Reynolds similarly violate the Eighth Amendment?

4.  Solitary confinement—which the DOC labels "segregation,"— means (at a minimum)

    removing an inmate from the general population and placing him, alone, in a locked cell for

    almost the entirety of each day.  The inmate is not permitted to socialize with other human

    beings. He is *alone*.  And being *alone* is the harshest punishment that it is within the power of

    the Department of Correction to mete out.

5.  This Court and others, as well as experts in the field of penology, have agreed that placing

    inmates in even short-term solitary confinement can cause wide-ranging and, often,

    permanent psychological harm.  See, e.g., *Porter v. Clarke*, 923 F.3d 348, 353 (4th Cir.

    2019), as amended (May 6, 2019); *Reynolds v. Arnone*, 3:13-cv-1465 (D. Conn. Aug. 27,

    2019). Additionally, see *The Effects of Solitary Confinement on Prison Inmates: A Brief*

    *History and Review of the Literature*, 34 Crime and Justice 441 (2006) at 504:

    > Solitary confinement harms prisoners who were not mentally ill on admission to prison
    > and worsens the mental health of those who were. The use of solitary confinement in
    > prisons should be kept at a minimum. In some prison systems, there is a clear and
    > significant overuse. This is especially apparent in the case of the U.S. supermax prisons.

6.  Scientific research demonstrates that human beings consistently suffer dysfunctional

    psychological states and outcomes when deprived of meaningful social contact and normal

sensory input (i.e., exposure to natural light, outdoor sounds, and varying colors). Scharff

summarizes studies showing that

> isolating people and severely restricting sensory stimulation can provoke a number of
> quite drastic reactions and symptoms—even after short durations of isolation (hours or
> days)—including, for example, hallucinations, confusion, lethargy, anxiety, panic, time
> distortions, impaired memory, and psychotic behavior.

> *Id.* at 471.

7.  Solitary confinement is particularly harsh at our State's SuperMax prison, Northern

    Correctional Institution.  NCI's architect is on record as stating that the DOC's instruction

    was to make NCI "hard." Yale Visual Art Project, *The Worst of the Worst: Portrait of a*

    *Supermax* (2012), *available at* *https://vimeo.com/54826024* (interview with James Kessler).

    There is good reason that being sent to NCI is considered "the ultimate sanction." *Id.*

    (interview with Michael Lawlor).

8.  Inmates housed at NCI spend most of their time alone in a cell roughly the size of a small

    bathroom, finished in bare concrete.  They experience the outside world through a 3-inch

    slot. The doors of the cells are provided with another slot—a trap through which correctional

    officers (COs) feed and, if necessary, medicate prisoners.  The same slot serves to permit

    prison personnel to secure inmates from without the door on those rare occasions when they

    are to be permitted outside their cell.  Solitary confinement at other Connecticut facilities is

    only marginally less harsh, because solitary confinement—the state of being alone and

    isolated—is, in itself, the harshest punishment.

9.  The retributive quality of solitary punishment is demonstrated by the fact the, until the court

    in *Reynolds* found C.G.S. 18-10b to be an unconstitutional bill of attainder, Connecticut

    simply substituted indefinite administrative segregation for the outlawed death penalty.

10. The DOC itself recognizes the severity of solitary confinement, in that it makes special

    provision for those held at NCI. Administrative Directive (AD) 8.5 ("Mental Health

    Services", available at https://portal.ct.gov/DOC/AD/AD-Chapter-8) states that

    > The contracted health services provider shall ensure that all inmates have access to
    > mental health services consistent with community standards of care regardless of gender,
    > physical disability or cultural factors. Access to mental health services shall be provided
    > at all facilities. *In addition, inmates housed at the Northern Correctional Institution shall
    > be evaluated by a qualified mental health professional no less frequently than every 30
    > days.*

    > AD 8.5(7) (emphasis added).

11. Additional DOC directives specify that special care be taken with inmates in restrictive

    housing (which includes solitary confinement).  AD 9.4, intended to govern restrictive status,

    (*available at https://portal.ct.gov/DOC/AD/AD-Chapter-9*) amplifies the point made in AD

    8.5(7):

    > When an inmate remains on restrictive housing status beyond 30 days, a psychologist or
    > psychiatrist shall conduct a personal interview with the inmate and document the
    > inmate's mental status in the inmate's health record. If confinement continues for an
    > extended period of time, the aforementioned psychiatric assessment shall be made every
    > three (3) months or as clinically necessary.

    > AD 9.4 (17)(D) (second clause, dealing with self-harming behaviors, omitted).

12. Unfortunately, receiving mental health care, like receiving physical health care, depends on

    adequate monitoring—in accord with the Administrative Directives cited above.  A Pew

    Charitable Trusts and Vera Institute of Justice survey from October 2017 found that

Connecticut has one of the worst prison health care quality monitoring systems in the nation.

Pew Charitable Trusts, *Prison Health Care: Costs and Quality* (Oct. 2017), available at

http://www.pewtrusts.org/~/media/assets/2017/10/sfh_prison_health_care_costs_

and_quality_final.pdf.

**JURISDICTION AND VENUE**

13. The plaintiff brings his claims pursuant to 42 U.S.C. § 1983 as well as the Eighth and

    Fourteenth Amendments to the United States Constitution.

14. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

15. Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2).

**PARTIES**

16. Plaintiff Jason Goode is a 44-year-old man from Waterbury, Connecticut.  In 1995 he was

    sentenced to his current term for murder.  He is presently incarcerated at NCI, and has been

    incarcerated at other DOC facilities as well.  During the period relevant to this complaint,

    Mr. Goode was housed at NCI and Walker Correctional Institution ("Walker").  Mr. Goode

    has a history of mental health problems dating back nearly 20 years.  A study performed in

    2003, when Mr. Goode was 28 years old (appended as Exhibit A) noted , *inter alia*, that

> Mr. [Goode] showed extreme elevations on a number of scales.  In terms of clinical
> syndromes, he showed signs of extreme anxiety, depression, alcohol dependence, and
> post-traumatic stress symptoms.
>
> Exhibit A at 10.

A later evaluation by a different psychologist, Dr. Marc Hillbrand (appended as Exhibit B)

cited the following DSM-V diagnostic formulation of Mr. Goode's condition:

"Posttraumatic stress disorder, chronic (developmental trauma disorder).  Mixed personality

disorder with borderline and schizotypal features." Exhibit B at 7.  Dr. Hillbrand further

observed that

> [w]hen [Goode] experiences sensory, interpersonal, or environmental stimuli that
> resonate with painful affective experiences from his childhood and adolescence, he
> respond[s] in a near automatic aggressive manner without regard to consequences.  This
> pattern could be described as *hit first, ask questions later.*  This allows him to establish a
> modicum of self-esteem by strengthening his core self concept of being a man who
> cannot be broken, dominated, intimidated, coerced, etc., even in a maximum security
> setting where he is never far from a dangerous situation.  The persistence of this self-
> defeating pattern in spite of the considerable cost to him is attributable to the fact that it
> preserves his self-esteem and protects him from experiencing intolerable states of anxiety
> and despair.
> ….
> His carceral adjustment has seen a repetition of this pattern as a function of his inability
> to tolerate even small challenges in this difficult environment, including crowding, noise,
> power differentials, dominance-submission tensions, etc.  This has led to multiple
> disciplinary infractions and several criminal charges that have led to a prolonged period
> of incarceration.
>
> *Id.* at 8, emphasis in original.

17. Defendant Rollin Cook is the current Commissioner of the DOC.  As such he is responsible

for protecting the constitutional rights of all individuals in DOC custody, including Mr.

Goode. Mr. Cook has final policy-making and supervisory authority within the DOC and is

therefore responsible for authorizing and maintaining policies and customs challenged by Mr.

Goode. At all relevant times, he was acting under color of state law. He is sued in his official

capacity for declaratory and injunctive relief and for compensatory damages.

18. Defendant Scott Semple was the Commissioner of the DOC from 2014–2019. At all relevant times, he acted under the color of state law and had final policy-making and supervisory authority within the DOC. During his tenure as DOC Commissioner, Mr. Semple was responsible for protecting the constitutional rights of all individuals in DOC custody. Additionally, he was instrumental in promulgating DOC Administrative Directive 9.4's "restrictive status" classifications, and for setting policies that preventing designated inmates from earning and receiving Risk Reduction Earned Credit. He was personally involved in authorizing and maintaining policies and customs that kept Mr. Goode in solitary confinement for extended periods. He directly and proximately caused the constitutional violations set forth below. He is sued in his individual capacity for damages.

19. The following Defendants have and/or had specific roles in designating and maintaining Mr. Goode as a "AS status prisoner on solitary confinement, and (in some cases, as outlined below) acted with deliberate indifference in ignoring grievance claims filed by Mr. Goode seeking to end the constitutional violation:

20. Defendant David Maiga is the Director of Offender Classification and Population Management. The unit that he directs coordinates offender classification efforts and is responsible for the assignment of offender movement throughout the entire infrastructure of the DOC. The unit is also responsible for assessment and classification of all adult males sentenced to greater than 2 years' incarceration. In this capacity, he had supervisory authority and was personally involved with Mr. Goode's various "restrictive status" classifications and his confinement in solitary confinement. Additionally, he is a member of the Unit

8

Classification Committee, a review board that oversees and is responsible for inmates on "special needs management" status. He directly and proximately caused the constitutional violation set forth below. At all relevant times, Mr. Maiga acted under color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

21. Defendant William Murphy[1] is the director of the DOC's Programs and Treatment Division. The division's Offender Classification and Population Management Unit is also responsible for assessing, classifying, and assigning offender risk levels.  . In this capacity, he had supervisory authority and was personally involved with Mr. Goode's various "restrictive status" classifications and his confinement in solitary confinement.  He directly and proximately caused the constitutional violation set forth below. At all relevant times, Mr. Murphy acted under color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

22. Defendant Ellen Durko is a registered nurse (RN) who failed to administer prescribed medication for Mr. Goode's diagnosed glaucoma condition in January 2019 during a period in which Mr. Goode was confined in such a manner that his hands became contaminated with urine and fecal material.  As such, she contributed to the cruel and unusual conditions of confinement that the plaintiff endured, and which form the basis of this complaint.  She is sued in her individual capacity for damages.

---

[1] Due to a typographical error that went unnoticed by the Plaintiff, the Plaintiff's affidavit incorrectly refers to *Brian* Murphy when the person concerned is actually *William* Murphy.

23. Defendant Kristine Barone is the Warden at NCI, and continued to maintain the plaintiff in Phase 2.  As such, she directly and proximately caused the constitutional violation set forth below. At all relevant times, Warden Mudano acted under color of state law. She is sued in her official capacity for declaratory and injunctive relief, and in her individual capacity for damages.

24. Defendant Giuliana Mudano was the Warden at NCI during 2019, and was put on notice by inmate grievances no later than July 2019 concerning the harsh Phase 1 conditions to which the plaintiff was subject, as well as of the Plaintiff's psychological disorders, but continued to maintain the plaintiff in Phase 1.  As such, she directly and proximately caused the constitutional violation set forth below. At all relevant times, Warden Mudano acted under color of state law. She is sued in her official capacity for declaratory and injunctive relief, and in her individual capacity for damages.

25. Defendant Angel Quiros is Deputy Commissioner of the DOC's Operations and Rehabilitative Services Division, and was during 2019 the Regional Warden over NCI.  As such he possessed policy-making and supervisory authority within the region that included NCI during the period with which this complaint is concerned. He was personally involved in authorizing and maintaining policies and customs challenged by Mr. Goode. He directly and proximately caused the constitutional violation described below. At all relevant times, he was acting under color of state law. He is sued in his official capacity for declaratory and injunctive relief, and in his individual capacity for damages.

26. Defendant Andrea Reischerl, DOC Psychiatric APRN, was charged with reviewing,

evaluating, and reporting the psychological condition of inmates held in solitary

confinement.  By the standards set by DOC's administrative directives, she failed to

adequately carry out this duty, and so contributed to the time the plaintiff spent in solitary

confinement in violation of his civil rights.  She is sued in her individual capacity for

damages.


**FACTUAL BACKGROUND**

27. Mr. Goode has spent the whole of 2019 to date in restricted housing—solitary confinement—

in Program phases 1 (at NCI) and 2 (at Walker).

28. During that time, he was not evaluated or assessed in accord with the DOC's administrative

directives bearing on care of inmates in restrictive housing (AD 8.5 and AD 9.4, *supra*).

29. Because he was not evaluated or assessed, Mr. Goode's mental health issues were

inadequately treated, and these issues continued and/or worsened.

30. These continuing untreated mental health issues are a proximate cause of his defiance of

prison authority see, e.g., Affidavit of Jason Goode (attached as Exhibit C) at paragraph 7;

Exhibit B at 8, *supra*.

31. Consequently Mr. Goode was and is on a treadmill; he is placed in segregation for his

behavior, but his behavior stems from psychological conditions and those psychological

conditions are not being treated.  There is the promise of escape but, in reality, there is none.

32. Indeed, as the court noted in *Reynolds*, being held in segregation exacerbates existing psychological problems—such as those already suffered by Mr. Goode.

33. By failing to provide the evaluations and assessments that its own administrative directives call for, DOC deprived and is continuing to deprive Mr. Goode of any meaningful opportunity to avoid segregation.

34. Consequently, Mr. Goode is, for all intents and purposes with regard to the nature of his confinement, in precisely the same position as the plaintiff in *Reynolds.*

35. Mr. Goode's unrelenting confinement in segregation has caused him severe and, in all probability, irreversible harm. He has suffered physical harm due to the lack of medication for his eyes and the conditions under which he has been forced to apply it. Perhaps more importantly, he has suffered severe emotional distress, anxiety attacks, and other mental health episodes resulting from his near-total isolation from other human beings and his lack of meaningful exercise and recreation. His pre-existing anger-management and social-interaction issues have been exacerbated, and he has been subjected to a Catch-22 situation in which his conditions of confinement have exacerbated the very behaviors used to justify those conditions in the first place.

36. Continued confinement in the cruel and unusual conditions of segregation and without mental health care will serve no purpose but to worsen the very behaviors that caused him to be placed in segregation and that have arguably been responsible for his entire acquaintance with the prison system in Connecticut.

**COUNT ONE: 42 U.S.C. § 1983 - EIGHTH AND FOURTEENTH AMENDMENTS, CRUEL AND UNUSUAL PUNISHMENT**

37. Mr. Goode incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

38. By designating and maintaining Mr. Goode in long-term solitary confinement, Defendants deprived Mr. Goode of the minimum civilized measure of life's necessities, and have violated his basic human dignity in contravention of contemporary standards of human decency.

39. Defendants' prolonged confinement of Mr. Goode in solitary confinement conditions on "restrictive status" constitutes cruel and unusual punishment. This confinement has inflicted and continues to inflict severe harm on Mr. Goode and, if it continue, there is a substantial risk of future harms.

40. Defendants have been deliberately indifferent to the obvious and well-documented risk of these harms.

41. Mr. Goode's long-term solitary confinement serves, and has served no legitimate penological purpose. Although the defendants have at times used disciplinary infractions to justify the conditions of Mr. Goode's confinement, they have deliberately failed to address these disciplinary issues in any constructive way or to consider that Mr. Goode's behavior is the product of mental-health issues that are plainly exacerbated by being placed in solitary confinement without meaningful mental-health treatment or rehabilitative programming.

42. This court, in *Reynolds v. Arnone*, has held solitary confinement to be a violation of the 8th Amendment, but Mr. Goode has been held in solitary confinement.  The DOC, through its own Administrative Directive 8.5, promises inmates "access to mental health services consistent with community standards of care."  That promise has not been kept.

43. By the foregoing actions, Defendants have violated and continue to violate Mr. Goode's Eighth and Fourteenth  Amendment rights.

**PRAYER FOR RELIEF**

44. WHEREFORE, Mr. Goode prays for judgment against the Defendants:

   a.  Declaring that Defendants have violated Mr. Goode's rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution;

   b.  Granting permanent injunctive relief enjoining Defendants and their successors, agents, and assigns from further violation of the Eighth and Fourteenth Amendments of the United States Constitution;

   c.  Awarding Mr. Goode compensatory damages for Defendants' Constitutional violations, including but not limited to Mr. Goode's emotional pain and suffering caused thereby;

   d.  Awarding Mr. Goode punitive damages;

   e.  Awarding Mr. Goode costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

f.  Granting such other monetary, equitable, or other relief as is authorized by law and as the Court deems just and proper.

45. Plaintiff seeks a jury trial on all issues so triable.


THE PLAINTIFF,
Jason Goode
Inmate No. 228240



BY _____
ANDREW MARCHANT-SHAPIRO
Ct No. 30095
8 Research Parkway,
Wallingford, Ct. 06492
P: (203) 936-9023
F: (203) 872-9007
E: ams@riverbridgeresolutions.com